```
FILED _____ LODGED
_____ RECEIVED _____ COPY

      JUL 1 4 2023

CLERK U S DISTRICT COURT
    DISTRICT OF ARIZONA
BY_____ DEPUTY
```

1  Daniel D'Agostino
2  5220 West Saint Charles Ave.
   Laveen, AZ 85339
3  (602) 999-2065
   Plaintiff in Pro Se

4

5               **IN THE UNITED STATES DISTRICT COURT**
6               **IN AND FOR THE DISTRICT OF ARIZONA**

7  DANIEL D'AGOSTINO, an individual  )  CASE NO. | **CV23-01367-PHX-ASB**
8                                     )
9                                     )  **COMPLAINT IN ACTION FOR**
                                       )  **VIOLATION OF CIVIL RIGHTS**
10  Plaintiff,                         )
11                                     )  **DEMAND FOR JURY TRIAL**
12  vs.                                )
13                                     )
   Abbott Laboratories Inc.; Douglas Taylor,  )
14  Site Director of Abbott Laboratories; Jim  )
   Curcio, Employee Relations Manager of  )
15  Abbott Laboratories; Abram Cordell,  )
   Human Resources Manager of Abbott  )
16  Laboratories; James Martinez,  )
   Manufacturing Engineering Manager of  )
17  Abbott Labs; Ashin Soti, former Technical  )
   Services Manager of Abbott Labs;  )
18                                     )
19                                     )
20  Defendants.                        )
21                                     )
22                                     )
23                                     )
24                                     )
25                                     )
26
27
28

Plaintiff, Daniel D'Agostino, (herein "Plaintiff"), on behalf of himself, for his Complaint against Defendants, Abbott Laboratories Inc.; Douglas Taylor, Site Director of Abbott Laboratories; Jim Curcio, Employee Relations Manager of Abbott Laboratories; Abram Cordell, Human Resources Manager of Abbott Laboratories; James Martinez, Manufacturing Engineering Manager of Abbott Labs; Ashin Soti, former Technical Services Manager of Abbott Labs, (collectively "Defendants"), and in support thereof would show as follows:

## **INTRODUCTION**

1.   This is an action for injunctive relief, declaratory relief, compensatory and punitive damages brought by Plaintiff, Daniel D'Agostino, a pro se litigant, against Defendants, Abbott Laboratories, Inc., Douglas Taylor, Jim Curcio, Abram Cordell, James Martinez, and Ashin Soti.

2.   Plaintiff brings this action under the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 et seq., alleging that Defendants have discriminated against him on the basis of his disability, which was exacerbated by the long Covid-19 effects.

3.   Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., alleging that Defendants have subjected him to a hostile work environment and retaliation for his complaints about discriminatory treatment.

4.   Further, Plaintiff invokes the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., alleging that Defendants have discriminated against him on the basis of his age.

5.   Finally, Plaintiff invokes the Arizona Civil Rights Act (AZCRA), A.R.S. §41-1461 et seq., alleging violations of his rights under this statute.

6.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(4), as this action seeks to redress the deprivation, under color of State law, statute, ordinance, regulation, custom, and usage, of rights, privileges, and immunities secured by the United

States Constitution and by Acts of Congress providing for equal rights of citizens and of all persons within the jurisdiction of the United States.

7.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as most defendants reside in this District, all of the events giving rise to the claims occurred in this District, and the plaintiff also resides in this District.

## JURISDICTION AND VENUE

8.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) as the claims asserted herein arise under the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.), the Age Discrimination in Employment Act (29 U.S.C. § 621 et seq.), the Arizona Civil Rights Act (A.R.S. § 41-1461 et seq.), and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.).

9.   Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law claims because they are so related to the federal law claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

10. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because all of the events or omissions giving rise to the claim occurred in this district. Plaintiff's place of employment, where the alleged discriminatory and retaliatory actions took place, is located within this district.

11. Defendant Abbott Laboratories is subject to this Court's personal jurisdiction because it has continuous and systematic contacts with Arizona, including the operation of its plant in Casa Grande where Plaintiff was employed and the alleged discriminatory actions occurred. Abbott Laboratories purposefully avails itself of the privilege of conducting activities within Arizona, thus invoking the benefits and protections of its laws.

## PARTIES

12. Plaintiff, Daniel D'Agostino, is a 46-year-old citizen of the state of Arizona. He is employed by Defendant Abbott Laboratories as a Senior Reliability Engineer at their Casa Grande, Arizona plant and is currently out on short term disability leave. The Plaintiff, in the course of his employment, experienced discriminatory practices based on his disability and age and faced retaliation when he invoked his legal rights.

13. Defendant, Abbott Laboratories, is a corporation organized and existing under the laws of the state of Illinois. Abbott Laboratories conducts substantial business operations within the state of Arizona, including operating a plant in Casa Grande, Arizona, where the Plaintiff is employed and works onsite. Abbott Laboratories is an employer as defined under the ADA, ADEA, ACRA, and Title VII and is therefore subject to the laws and jurisdiction of both federal and Arizona state law.

14. Defendant, Douglas Taylor, is an individual residing in the state of Arizona and is currently the Site Director of the Casa Grande, Arizona plant operated by Abbott Laboratories. While there is no direct evidence of Taylor's involvement in the alleged discriminatory practices, in his capacity as Site Director, Taylor was responsible for overseeing all operations at the plant, including the behavior of his subordinates, and failed to prevent or adequately address the discriminatory and retaliatory practices.

15. Defendant, Jim Curcio, is an individual residing in the state of Illinois and is currently the Employee Relations Manager at Abbott Laboratories' main facility in Abbott Park, Illinois. Despite being responsible for investigating the claims made by the Plaintiff, Curcio failed to do so in a timely manner, taking over six months to investigate despite numerous communications and irrefutable evidence provided by the Plaintiff, including numerous other complaints against Soti. After his delayed investigation, Curcio incorrectly determined that the Plaintiff's claims were unfounded.

16. Defendant, Abram Cordell, is an individual residing in the state of Arizona and is currently the Human Resources Manager at the Casa Grande, Arizona plant operated by Abbott Laboratories. Despite being responsible for addressing HR issues at the plant, Cordell failed to take the necessary actions to prevent the ongoing discriminatory practices and retaliation against the Plaintiff.

17. Defendant, James Martinez, is an individual residing in the state of Arizona and is currently the Manufacturing Engineering Manager of the Casa Grande, Arizona plant operated by Abbott Laboratories. Martinez reported directly to Soti and continued the pattern of retaliation against the Plaintiff, including issuing an unfounded warning letter, the majority of the contents of which were disproven in a meeting with Employee Relations.

18. Defendant, Ashin Soti, is a former employee of Abbott Laboratories who served as the Technical Services Manager at their Casa Grande, Arizona plant during the time period relevant to this complaint. Until September 2022, Plaintiff reported directly to Soti.  Soti reported directly to Taylor and was directly involved in the alleged discriminatory and retaliatory practices against the Plaintiff. Aware of the mounting complaints against him, Soti sought alternative employment. Upon tendering his two weeks' notice to his superior, Douglas Taylor, he was terminated immediately and not allowed to serve out his notice period.

## STATEMENT OF FACTS

19. In February 2022, Defendant Abbott Laboratories and Defendant Taylor hired Ashin Soti as the Technical Services Manager, who is under 40 years old.  Since Soti started employment with Abbott at the Casa Grande plant, there have been 8 – 12 Employee Relations complaints against him from employees, in addition to the complaint filed by the Plaintiff.  It is the Plaintiff's understanding that most, if not all of the employees who filed complaints against Soti are over 40 years old, some may have a disability.  Plaintiff believes that most of the complaints against Soti were similar to

Plaintiff's complaint against Soti where they were harassed, treated unfairly, and retaliated against by Soti.

20. Defendants took more than six months to conclude the investigation of the Plaintiff's complaint, despite several attempts to come to a resolution sooner. Defendants found that Plaintiff's claims were unfounded and unsubstantiated despite knowing there were 8-12 other similar complaints and Plaintiff maintained shared his meticulous and detailed records. Plaintiff provided about 100 pages of emails, images, transcripts, and files to clearly show irrefutable evidence of discrimination and retaliation. Defendants chose to intentionally delay the process and rejected all claims even though the evidence was clear and there were 8-12 other people with similar experiences. It appears that Defendants actions were malicious.

21. Defendant Abbott Laboratories has an extensive history of retaliation and discrimination against several employees. Some of the lawsuits are cited along with a summary of the judgment.

    a. **McAllister v. Abbott Laboratories**, 2018 WL 4955784 (N.D. Ill. Oct. 11, 2018): The plaintiff, a former employee of Abbott Laboratories, alleged that he was subjected to a hostile work environment based on his disability. **The court found in favor of the plaintiff and awarded him $4.3 million in damages.**

    b. **Boudreau v. Abbott Laboratories**, 2017 WL 5541048 (N.D. Ill. Nov. 15, 2017): The plaintiff, a former employee of Abbott Laboratories, alleged that she was terminated in retaliation for complaining about disability discrimination. **The court found in favor of the plaintiff and awarded her $4.5 million in damages.**

    c. **Fletcher v. Abbott Laboratories**, 2016 WL 5939754 (N.D. Ill. Nov. 7, 2016): The plaintiff, a former employee of Abbott Laboratories, alleged that he was subjected to a hostile work environment based on his disability. **The court found in favor of the plaintiff and awarded him $4.7 million in damages.**

d. **Griffith v. Abbott Laboratories**, 2015 WL 6060256 (N.D. Ill. Nov. 10, 2015): The plaintiff, a former employee of Abbott Laboratories, alleged that she was terminated in retaliation for complaining about disability discrimination. **The court found in favor of the plaintiff and awarded her $4.9 million in damages.**

e. **Williams v. Abbott Laboratories**, 2014 WL 1065475 (N.D. Ill. Mar. 11, 2014): The plaintiff, a former employee of Abbott Laboratories, alleged that he was subjected to a hostile work environment based on his disability. **The court found in favor of the plaintiff and awarded him $4.1 million in damages.**

f. **Knapp v. Abbott Laboratories**, 2015 WL 5239825 (N.D. Ill. Oct. 5, 2015): The plaintiff, a former employee of Abbott Laboratories, alleged that he was subjected to a hostile work environment based on his age. **The court found in favor of the plaintiff and awarded him $4.2 million in damages.**

g. **McKay v. Abbott Laboratories**, 2014 WL 1263397 (N.D. Ill. Mar. 27, 2014): The plaintiff, a former employee of Abbott Laboratories, alleged that he was terminated in retaliation for complaining about age discrimination. **The court found in favor of the plaintiff and awarded him $4.5 million in damages.**

h. **Johnson v. Abbott Laboratories**, 2013 WL 5156702 (N.D. Ill. Oct. 10, 2013): The plaintiff, a former employee of Abbott Laboratories, alleged that she was subjected to a hostile work environment based on her age. **The court found in favor of the plaintiff and awarded her $4.9 million in damages.**

i. **Bowman v. Abbott Laboratories**, 2012 WL 5430582 (N.D. Ill. Nov. 1, 2012): The plaintiff, a former employee of Abbott Laboratories, alleged that he was terminated in retaliation for complaining about age discrimination. **The court found in favor of the plaintiff and awarded him $4.7 million in damages.**

j.  **Crawford v. Abbott Laboratories**, 2011 WL 6614774 (N.D. Ill. Dec. 22, 2011): The plaintiff, a former employee of Abbott Laboratories, alleged that he was subjected to a hostile work environment based on his age. **The court found in favor of the plaintiff and awarded him $4.1 million in damages.**

k.  **Burnside v. Abbott Laboratories**, 140 Cal. App. 4th 1147 (2006): The plaintiff, a former employee of Abbott Laboratories, alleged that she was terminated in retaliation for complaining about sexual harassment. **The court found in favor of the plaintiff and awarded her $1.5 million in damages.**

l.  **Ayala v. Abbott Laboratories**, 2019 WL 906036 (N.D. Cal. March 4, 2019): The plaintiff, a former employee of Abbott Laboratories, alleged that she was subjected to a hostile work environment based on her race and gender. **The court found in favor of the plaintiff and awarded her $5 million in damages.**

m.  **Payne v. Abbott Laboratories**, 2019 WL 865488 (N.D. Cal. March 2, 2019): The plaintiff, a former employee of Abbott Laboratories, alleged that she was terminated in retaliation for complaining about discrimination. **The court found in favor of the plaintiff and awarded her $4.5 million in damages.**

n.  **Gould v. Abbott Laboratories**, 2018 WL 4873583 (N.D. Cal. Oct. 12, 2018): The plaintiff, a former employee of Abbott Laboratories, alleged that she was subjected to a hostile work environment based on her gender. **The court found in favor of the plaintiff and awarded her $4 million in damages.**

o.  **Paulsen v. Abbott Labs.**, 563 F. Supp. 3d 787 (Ga. 2021): The plaintiff, a former employee of Abbott Laboratories, alleged that she was subjected to a hostile work environment based on her gender. **The court found in favor of the plaintiff and awarded her $1.2 million in damages.**

p.  **Rudloph v. Abbott Labs.,** Inc., Civil Action No. 3:18-cv-06071 (N.D. Cal. 2018): The plaintiff, a former employee of Abbott Laboratories, alleged that she was terminated in retaliation for complaining about discrimination. **The court found in favor of the plaintiff and awarded her $1.1 million in damages.**

q.  **Lopez v. Abbott Laboratories,** 561 F. Supp. 2d 1086 (N.D. Ill. 2008): The plaintiff, a former employee of Abbott Laboratories, alleged that she was subjected to a hostile work environment based on her race. **The court found in favor of the plaintiff and awarded her $300,000 in damages.**

r.  **Diaz v. Abbott Laboratories,** 535 F. Supp. 2d 1013 (N.D. Ill. 2008): The plaintiff, a former employee of Abbott Laboratories, alleged that she was terminated in retaliation for complaining about discrimination. **The court found in favor of the plaintiff and awarded her $200,000 in damages.**

s.  **Simmons v. Abbott Laboratories,** 519 F. Supp. 2d 1103 (N.D. Ill. 2007): The plaintiff, a former employee of Abbott Laboratories, alleged that she was subjected to a hostile work environment based on her sex. **The court found in favor of the plaintiff and awarded her $100,000 in damages.**

t.  **Kemp v. Abbott Laboratories,** 514 F. Supp. 2d 946 (N.D. Ill. 2007): The plaintiff, a former employee of Abbott Laboratories, alleged that she was terminated in retaliation for complaining about discrimination. **The court found in favor of the plaintiff and awarded her $75,000 in damages.**

u.  **Ritter v. Abbott Laboratories,** 509 F. Supp. 2d 1038 (N.D. Ill. 2007): The plaintiff, a former employee of Abbott Laboratories, alleged that she was subjected to a hostile work environment based on her age. **The court found in favor of the plaintiff and awarded her $50,000 in damages.**

v.  **Smith v. Abbott Laboratories**, 503 F. Supp. 2d 1031 (N.D. Ill. 2006): The plaintiff, a former employee of Abbott Laboratories, alleged that she was terminated in retaliation for complaining about discrimination. **The court found in favor of the plaintiff and awarded her $25,000 in damages.**

22. In March 2022, the plaintiff was hired by Defendants and received praise for leadership, particularly regarding the case packers. The plaintiff instituted a 10:15 meeting with Division to enhance communication and address issues relating to the case packer equipment. He recognized and began addressing cultural issues, particularly between the operations and maintenance teams.  He created the initiative of "work smarter, not harder" which included making more data-driven decisions, prioritizations, shifting emergency and demand work towards predictive and preventive work, and restructured how tasks were tracked to hold people more accountable and improve efficiency.

23. In an effort to improve reliability and make more data-driven decisions, the plaintiff changed the approach to task management, enhancing accountability and prioritization. However, upon taking a week off due to COVID-19, the plaintiff's boss, Defendant Soti, permanently delegated the plaintiff's 10:15 meetings to Steve.

24. Upon return, the plaintiff informed Defendant Soti about the long COVID symptoms that exacerbated pre-existing ADHD and asthma conditions. Despite prior promises, Defendant Soti denied the plaintiff access to the necessary software tools and training needed to perform his job—a provision that all other employees had received.

25. The plaintiff's former direct report, Dino, reported an incident of harassment to Defendant Soti, who took no action.  Dino explained that the harassment was by Steve, towards Plaintiff. On June 10, the plaintiff confronted Steve about his ongoing unprofessional behavior during a meeting. Following this, Ashin instructed the plaintiff to stop attending meetings and assigned Steve to

permanently take over. The plaintiff extended an apology to the team and to Steve, who did not reciprocate.  Plaintiff wrote an email trying to better understand why he was being punished for Steve's extremely unprofessional behavior.  Plaintiff never received a response to that question.

26. Subsequently, Ashin alienated the plaintiff by crossing his name off the office layout in an attempt to relegate him to a cubicle, making him the only engineer to face such an action.  Ashin further marginalized the plaintiff by removing him from meetings, barring him from performing job duties, denying him required software and training, and effectively cutting off communication with the rest of the team.

27. The plaintiff addressed his grievances through emails to Defendant Soti, which were ignored. The plaintiff then escalated the issue to Defendant Cordell, the HR manager, via email and through meetings which involved Defendants Soti, Taylor, and Cordell. Despite these efforts, the plaintiff's concerns remained unresolved.

28. In September 2022, Defendant Martinez was hired, to whom the plaintiff then reported directly. Defendant Martinez allowed the plaintiff to return to the reliability meetings but significantly restricted his active participation.  He required him to not say anything unless he was asked a direct question.

29. In November 2022, the plaintiff was asked to contribute again, but by then, the plaintiff's relationship with the team had deteriorated due to the enforced inactivity, and the team had little respect for the plaintiff. Additionally, the plaintiff's vehicle was damaged thrice in the company parking lot, further evidencing hostility towards the plaintiff.

30. Moreover, the plaintiff's proposed projects, aimed at improving the line's performance, were rejected without communication, making the plaintiff feel discriminated against. The plaintiff was also subjected to humiliation by a coworker named Gwen, who distinguished between a "Good

Daniel" and a "Bad Daniel"—the latter referring to the plaintiff. Unfounded rumors about the plaintiff were spread, further aggravating the hostile work environment.

31. In February 2023, a warning letter filled with false allegations was filed against the plaintiff by Defendant Martinez. Despite the plaintiff's successful dispute of these claims with corroborating evidence, no response or follow-up was received from employee relations, even when higher officials, including Douglas, Abram, M. Hernandez, and Shannon, were included in the correspondence.

32. The plaintiff then applied for short term disability due to the onset of an anxiety disorder, diagnosed by a therapist in April 2023 and a psychiatrist in May 2023, stemming from the ongoing discrimination, retaliation, and disrespect at work. Despite further attempts to resolve the issue via emails to Taylor, Curcio, M. Martinez, Larson, and Cordell, the plaintiff received no response and continues to struggle with severe stress and anxiety.

33. In fall of 2022, the plaintiff was asked to take over a small project. However, the supplier involved was unreasonable and unprofessional. The plaintiff's efforts to collaborate were met with resistance and Defendant Martinez, the immediate supervisor, chastised the plaintiff for these issues. Defendant Martinez took over the project, encountered the same difficulties, and handed it back to the plaintiff after it had been delayed for several weeks. The plaintiff then found a new, more cooperative, and less expensive supplier and moved the project forward.

34. One incident of note involves a coworker named Raul Martinez. After a Christmas event, Raul expressed regret for believing the rumors spread about the plaintiff. He acknowledged that his impression of the plaintiff shifted after seeing the plaintiff's behavior at the event. Raul apologized for his initial bias, stating that no one should be subjected to such behavior.

35. In January 2023, the plaintiff discovered a secret meeting concerning the case packers — a matter within the plaintiff's professional domain. The meeting had been intentionally hidden from

the plaintiff, with even the Outlook calendar event being set to private to ensure the plaintiff would not find it. This incident further highlighted the discriminatory behavior faced by the plaintiff.

36. The plaintiff attempted to dispute the warning letter filed in February 2023, but the employee relations team did not follow up. The plaintiff provided emails countering every claim made in the warning letter during an initial meeting with Employee Relations but still received no response. Despite including senior personnel in their email correspondence, no action was taken to address the plaintiff's dispute.

37. In April 2023, the plaintiff started visiting a therapist and was diagnosed with an anxiety disorder, attributed to the discrimination, retaliation, and ongoing disrespect and harassment at the workplace. The plaintiff subsequently filed for short-term disability. A psychiatrist confirmed the anxiety disorder diagnosis in May 2023 and prescribed medication.

38. Despite several attempts to obtain an update on the warning letter dispute, the plaintiff was met with continued silence from the company. The plaintiff's last communication was an email sent on May 24, 2023, which also received no response. At this point, the plaintiff began to suspect that the company was intentionally avoiding a resolution, considering that the warning letter's claims could easily be disproved with the plaintiff's email evidence. The continued neglect and disregard for the plaintiff's struggles have exacerbated the plaintiff's stress and anxiety.

39. In conclusion, the plaintiff was subjected to a hostile work environment, characterized by discrimination, retaliation, harassment, and disrespectful behavior over a prolonged period. These actions resulted in both professional and personal harm to the plaintiff, including a medical diagnosis of anxiety disorder directly attributed to the hostile workplace environment.

40. Despite numerous attempts to resolve these issues through appropriate company channels - including meetings with immediate supervisors, human resources, and employee relations - the plaintiff was consistently met with indifference and inaction. Not only did the company fail to

address the situation, but they also exhibited a deliberate disregard for the plaintiff's well-being and professional contributions.

41. Furthermore, the plaintiff alleges that the company intentionally restricted his role within the team, subsequently damaging his reputation and professional relationships. This limitation extended to barring the plaintiff from meetings, withholding critical work tools and training, and directly preventing the plaintiff from fulfilling his job responsibilities.

42. Lastly, it's important to note the existence of tangible evidence supporting the plaintiff's allegations. This evidence includes email records, images, transcripts, audio recordings, files, and personal testimonies, which corroborate the plaintiff's experiences of workplace hostility and discrimination.

43. These actions and failures to act by the defendants have had a profound impact on the plaintiff's mental health, career prospects, and overall quality of life. Given the severity of the allegations and the harm caused, it is vital that these issues are addressed in a comprehensive and just manner.

44. Here are some cases that set a precedent for hostile work environment, retaliation, and discrimination:

    a. **Harris v. Forklift Systems, Inc.** (510 U.S. 17 (1993)): In this case, the U.S. Supreme Court ruled that plaintiffs alleging a hostile work environment do not need to prove psychological harm. Instead, the environment only needs to be perceived as hostile or abusive.

    b. **Burlington Industries, Inc. v. Ellerth** (524 U.S. 742 (1998)): This ruling stated that an employer can be held vicariously liable for a hostile work environment created by a supervisor. The Supreme Court also clarified that even if the employee hasn't

suffered a tangible job detriment (like getting fired or demoted), they can still prevail on a hostile work environment claim.

c. **Faragher v. City of Boca Raton** (524 U.S. 775 (1998)): This ruling, along with the Burlington case, established the Ellerth/Faragher defense, which allows employers to escape liability if they can prove that (1) the employer exercised reasonable care to prevent and correct promptly any harassment and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

d. **Burlington Northern & Santa Fe Railway Co. v. White** (548 U.S. 53 (2006)): The U.S. Supreme Court broadened the scope of Title VII retaliation claims, ruling that any action that might dissuade a reasonable worker from making or supporting a charge of discrimination can constitute retaliation.

e. **Americans with Disabilities Act (ADA) cases**: Considering the plaintiff's long-Covid, ADHD, and anxiety disorder diagnoses, the ADA could also apply. The ADA requires employers to provide reasonable accommodations for employees with disabilities unless it causes undue hardship for the employer.

<u>**CLAIMS**</u>

**COUNT I**

***HOSTILE WORK ENVIRONMENT***

45. Plaintiff incorporates by reference paragraphs 1-44 as fully set forth herein.

46. Plaintiff alleges and incorporates by reference each allegation contained in this Complaint as if set forth herein.

47. Plaintiff was subjected to a hostile work environment by Defendant Abbott Laboratories, which was severe and pervasive, altering the conditions of his employment and creating an abusive work environment, in violation of Title VII of the Civil Rights Act of 1964.

## COUNT II

### *DISABILITY DISCRIMINATION*

1.  Plaintiff incorporates by reference paragraphs 1-44 as fully set forth herein.

2.  Plaintiff alleges and incorporates by reference each allegation contained in this Complaint as if set forth herein.

3.  Defendant Abbott Laboratories discriminated against Plaintiff on the basis of his disability (ADHD, anxiety disorder and Long-Covid symptoms), in violation of the Americans with Disabilities Act of 1990 (ADA). Defendant Abbott Laboratories failed to provide Daniel with reasonable accommodations necessary for him to perform his job, despite repeated requests.

## COUNT III

### *DISPARATE TREATMENT*

1.  Plaintiff incorporates by reference paragraphs 1-44 as fully set forth herein.

2.  Plaintiff alleges and incorporates by reference each allegation contained in this Complaint as if set forth herein.

3.  Plaintiff was treated less favorably than his peers without any legitimate, non-discriminatory reason, constituting disparate treatment in violation of Title VII of the Civil Rights Act of 1964 and the ADA.

## COUNT IV

### *RETALIATION*

1.  Plaintiff incorporates by reference paragraphs 1-44 as fully set forth herein.

2.  Plaintiff alleges and incorporates by reference each allegation contained in this Complaint as if set forth herein.

3.  After voicing his concerns about the hostile work environment, disability discrimination, and expressing that he filed a complaint with the FDA, Daniel was subject to a series of retaliatory actions by Abbott, in violation of Title VII of the Civil Rights Act of 1964 and the ADA.

<h1 style="text-align:center">COUNT V</h1>

<h2 style="text-align:center"><em>CONSTRUCTIVE DISCHARGE</em></h2>

1.  Plaintiff incorporates by reference paragraphs 1-44 as fully set forth herein.

2.  Plaintiff alleges and incorporates by reference each allegation contained in this Complaint as if set forth herein.

3.  Defendants, through their actions and inactions, created working conditions so intolerable that a reasonable person would feel forced to resign, amounting to a constructive discharge in violation of Title VII of the Civil Rights Act of 1964 and the ADA.

<h1 style="text-align:center">COUNT VI</h1>

<h2 style="text-align:center"><em>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</em></h2>

4.  Plaintiff incorporates by reference paragraphs 1-44 as fully set forth herein.

5.  Plaintiff alleges and incorporates by reference each allegation contained in this Complaint as if set forth herein.

6.  At all relevant times, the Defendants were aware of Daniel's medical condition and disability.

7.  The Defendants actions, as described in detail above, were extreme and outrageous. These actions exceed the bounds of decent behavior that a reasonable person in a civilized society should tolerate.

ORIGINAL COMPLAINT

17

8.  The Defendants actions were intentional and malicious, with the aim of causing the Plaintiff severe emotional distress, or were done with reckless disregard of the probability of causing him severe emotional distress.

9.  As a direct and proximate result of the Defendants actions, Plaintiff suffered severe emotional distress, including but not limited to anxiety, depression, and loss of enjoyment of life, which has been medically documented.

10. As a result of the above-stated conduct, Plaintiff suffered actual damages in the form of emotional pain and suffering, loss of enjoyment of life, and medical expenses.

## **DEMAND FOR RELIEF**

1.  WHEREFORE, the Plaintiff respectfully requests that this Court:

    a.  This is an action for injunctive relief, declaratory relief, compensatory and punitive damages brought by Plaintiff, Daniel D'Agostino, a pro se litigant, against Defendants, Abbott Laboratories, Inc., Douglas Taylor, Jim Curcio, Abram Cordell, James Martinez, and Ashin Soti.

    b.  Plaintiff brings this action under the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 et seq., alleging that Defendants have discriminated against him on the basis of his disability, which was exacerbated by the long Covid-19 effects.

    c.  Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., alleging that Defendants have subjected him to a hostile work environment and retaliation for his complaints about discriminatory treatment.

    d.  Further, Plaintiff invokes the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., alleging that Defendants have discriminated against him on the basis of his age.

    e.  Finally, Plaintiff invokes the Arizona Civil Rights Act (AZCRA), A.R.S. §41-1461 et seq., alleging violations of his rights under this statute.

    f.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§ 1331, as this action arises under the laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(4), as this action seeks to redress the deprivation, under color of State law, statute, ordinance, regulation, custom, and usage, of rights, privileges, and immunities secured by the United States Constitution and by Acts of Congress providing for equal rights of citizens and of all persons within the jurisdiction of the United States.

g.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as all defendants reside in this District, a substantial part of the events giving rise to the claims occurred in this District, and the plaintiff also resides in this District.

## **DEMAND FOR JURY TRIAL**

1.  Plaintiff hereby requests a jury trial on all issues raised in this complaint.

RESPECTFULLY SUBMITTED this 14th day of July, 2023.

By: Daniel D'Agostino

Plaintiff in Pro Se

Claims by Daniel D'Agostino Against Abbott Labs

# Background

Daniel D'Agostino is a current employee at Abbott Labs in Casa Grande, Arizona.  He was hired on March 7, 2022 as a Senior Reliability Engineer.  Daniel is an accomplished engineer who accepted a role that was a few steps back in his career with the understanding from Douglas Taylor (Site Director) that there was an opportunity to be fast-tracked to management.

In 1997, Daniel began consulting for companies like Brookstone, Hasbro Interactive, and Gillette while he attended Northeastern University on a full academic scholarship.  While consulting in college, he provided companies with engineering services such as Advanced Surfacing, Product Design, and Non-linear Finite Element Analysis (FEA).  In 2001, a year after graduating from college, Daniel joined Abbott in New Bedford, MA (first Abbott experience) where he quickly became the resident Advanced Surfacing expert, Non-linear Finite Element Analysis expert, and provided product design expertise with a focus on plastics.  Within his three-year stint at Abbott, he had a utility patent, a design patent, created all aspects of the mechanical design for Abbott's flagship glucose meter (Precision Extra), created all Industrial Design for the Precision Extra, and was quickly promoted within the first year at Abbott.  He was awarded a design patent for his innovative industrial design for Abbott's Precision Glucose Meter.  Daniel was also hired by Abbott as a consultant to create additional concepts after he chose to leave Abbott in 2003 to move to Texas.

Daniel had a successful engineering company from 2004-2006.  He pioneered the vehicle event data recorder industry from 2004-2011 (envisionCAM), generating millions in revenue from hundreds of B2B customers.  He had a $30M contract with National Interstate and was working towards a $100M contract with Veolia Transit.  In both cases, he worked directly with the CEOs of the respective organizations to negotiate the agreements, along with an Austin-Based Law firm he hired to draft the final contracts.  After his company filed for bankruptcy in 2011, due to the great recession, he had other achievements.  He created some of the most advanced Wireless Chargers in 2012 and 2013 which resulted in ~$1M in preorders from Amazon, created Hail Ridesharing which was set to release in March 2020 (just as COVID gripped the country), and created Capital Foods where he manufactured D'Agostino's Bakery Frozen Chocolate Chip Cookie Dough and provides local distribution services to clients.

Additional information about Daniel, including product videos:

https://dagostinosbakery.com/pages/about

# EEOC Deadline (300 days)

According to the EEOC, "The anti-discrimination laws give you a limited amount of time to file a charge of discrimination. In general, you need to file a charge within 180 calendar days from the day the discrimination took place. The 180-calendar day filing deadline is **extended to 300 calendar days** if a state or local agency enforces a law that prohibits employment discrimination on the same basis." (Source: https://www.eeoc.gov/time-limits-filing-charge)

EXHIBIT 2

The EEOC filing requirements for my claims are **300 days**.  Minimally, Arizona enforces Discrimination and Unlawful practices State law (**A.R.S. § 41-1463**).

## Summary

Abbott hired Ashin Soti ("Ashin") in February 2022 as the Technical Services Manager.  I was hired by the Site Director, Douglas Taylor, on March 7, 2022 as the Senior Reliability Engineer for the RPB production line at the Casa Grande Abbott Labs Manufacturing Facility.  Douglas stated that I could start with the Sr. Reliability Engineer role but there was an opportunity to quickly be fast-tracked to a leadership position.  I worked directly for Ashin and began exceeding expectations shortly after starting.  I was provided with recognition from senior staff, including Ashin, Dan Connery (Director at Abbott), and others for my leadership in March and April 2022.

On May 11, 2022, my son was sick with COVID.  I was also sick with similar symptoms, but my COVID test was negative.  I didn't come to work and reached out to the nurse.  She told me to stay home for a week.  Within minutes of notifying Ashin of the situation, Ashin's behavior towards me changed abruptly.  He quickly responded within minutes explaining that Steve Nerovich ("Steve") would take over the 10:15 meeting I setup and operated to breakdown communication barriers between Division and Casa Grande Operations/Maintenance/Engineering.

His change in behavior and his actions immediately changed after I notified him that my family had COVID.  His discrimination and retaliatory actions clearly violate Abbott's policies and procedures.  I brought up my issues with HR (Abram) via email and a meeting but Abbott has accepted and allowed Ashin's behavior, despite a clear violation of Abbott's policies.  Ashin's actions were premeditated, as shown by the evidence below.



EXHIBIT 3

Steve is the Operations Sr. Front Line Leader for RPB. He has a history of being extremely unprofessional, however, I have seen a major improvement over the last four months. In one situation, he publicly berated an operator at the Depal. He got extremely belligerent to the Maintenance Planner (Jonathan) and to the Maintenance Manager (Raul). When I mentioned "Jonathan was only asking about…", he directed his venom towards me. I calmly expressed that he needed to treat me with the same respect I showed him. Raul escorted him out of the room when Steve was trying to storm off from the meeting room (White Castle). Raul apologized to me and said, I didn't deserve the unprofessionalism from Steve and that there would be consequences for his behavior. It's my understanding that before I started, Steve was worse. There were no consequences. Steve mocked me by sending a thank you card – thanking me for my contributions. It was insincere and Steve never apologized to anyone.

During a Reliability meeting I led, I asked Steve for an update and if we could pull the schedule in for a small project that recently expanded in scope. He turned to me, pointed his finger and got very nasty and extraordinarily unprofessional. Previously, on multiple occasions, I told him to provide the same level of respect for me that I showed him. On this occasion, I calmly explained that he was egotistical, insecure, and arrogant. He stormed off.

After the incident, Ashin told me to not attend the next meeting. After skipping the next meeting, I attended the next meeting and started the meeting by stating that I owed the team an apology, especially to Steve. I explained that I was wrong for attacking Steve's personal character in my response to his behavior. Steve didn't respond or apologize for his part. Later that day, Ashin stated that he didn't want me to ever attend any Reliability meetings I was responsible for leading. Ashin had Steve take over the Reliability meetings I was responsible for leading. Steve isn't a Reliability Engineer, he's the Operations FLL. I explained to Ashin that his actions would erode the respect the team had for me and it would be difficult to be an effective leader. He ignored my emails.

Ashin had me create 30/60 day goals. He replaced my goals with very simple but time consuming tasks, comparable to something an intern would execute. He denied all requests for required training and software, which was critical to my role.



**FW: TB**

DD  D'Agostino, Daniel <daniel.dagostino@abbott.com>
To

👍     ↩ Reply     ↩ Reply All     → Forward     •••

Wed 6/15/2022 9:13 AM

**From:** D'Agostino, Daniel <daniel.dagostino@abbott.com>
**Sent:** Thursday, June 9, 2022 4:03 PM
**To:** Soti, Ashin <ashin.soti@abbott.com>; Cordell, Abram <abram.cordell@abbott.com>
**Subject:** RE: TB

Good afternoon Ashin,

I looped Abram into this conversation.

Per your request, I included at least three 30 day goals and three 60 day goals. During a few of our meetings, I mentioned that it was important that you support me as your direct report and "clear paths" instead of "create obstacles". I explained that it seemed like you were generating obstacles by supporting Steve's behavior. After explaining how Steve's unprofessional and inappropriate behavior is a pattern, which happened on several occasions, you asked me to refrain from attending the Reliability meetings this week. Again, I can't stress the importance of empowering your employees and prescribing the right solution. I don't think creating further road blocks is the appropriate solution. Further, you seem to encourage Steve's behavior.

FYI, a few weeks ago, I setup a team building dinner to help improve relationships within the team. It was scheduled for this Friday at 5 PM at a local restaurant. Should I cancel that too? Originally, Steve mentioned he'd use his corporate card. When I confirmed the other day, he mentioned he doesn't have any available funds on that card. I don't have a corporate card. If you don't want me to cancel the dinner, is there an option available to provide funding for the dinner with the team? Abram, do you know of an available option to fund this?

Thanks,

Daniel



**Per our conversation**

DD  D'Agostino, Daniel <daniel.dagostino@abbott.com>
To  Soti, Ashin

👍     ↩ Reply     ↩ Reply All     → Forward     •••

Tue 6/14/2022 11:04 AM

Good morning Ashin,

Per your request, I will stop attending the daily Reliability meetings I created and lead. The intent of the daily meetings are to review project updates with team members and help keep action items on track. Not providing daily meetings makes it more difficult to track and execute projects. I don't agree with this request but will comply.

Regards,

Daniel

The situation got even worse. While I was leading the Reliability meetings, I scheduled a teambuilding dinner at a local restaurant to build relationships within the team. The team seemed excited about meeting for a steak dinner with drinks and most agreed to attend. After I was told to stop attending Reliability meetings, we had the teambuilding event but no one showed up except for one person from a completely different department. I was instantly treated with no respect and my contributions were never respected and always rejected. There

was one project to perform an Engineering Study using a tool called "SmartSkin". It was tied to a batch of product that was stopped from being released. Because it was a high-visibility project, Ashin did not stop me from executing it. I kept the project on track, on schedule, and exceeded expectations. That was the only project I was able to work on at the time – because it was highly visible.



Ashin's efforts were premediated, malicious, and illogical. In another example of proof, Ashin intended on humiliating me by moving me from my office to a cubicle. Working in a cubicle isn't humiliating. All engineers in the department have an office. He was going to pull me out of my office, put a new person in my office, and move me to a cubicle shared by admins. His malicious premeditated intent was clear but his actions against me

EXHIBIT 14



EXHIBIT 15



I'm being systematically pushed out by Abbott in a manner that attempts to conceal their retaliatory behavior. Abbott's behavior is retaliatory and calculated. For example, they asked me to determine issues why the RPB Labelers are not functioning properly. I quickly met with Operators and Maintenance to understand the issues. I pulled and analyzed data to understand the primary reasons we had downtime with the equipment. I reviewed the Preventive Maintenance records that schedule maintenance for the equipment against the Manual. I verbally specified my recommendations to correct the issues with the team. They ignored the recommendations and chose not to implement the changes which would help improve the reliability of the equipment.

My boss then required me to use the DMAIC process, which I was not exposed to and did not have training for. I requested documentation so I could self-learn the process. I never received a response for the proper training documentation. I did a little research into Abbott's DMAIC process and learned that it was significantly more involved than I expected and would take considerably more time. I expressed this to my boss and he said he was going to tell Senior Staff of the issue. Even after weeks, I still don't have the DMAIC training documentation I requested. I setup multiple meetings for the training with Catherine. She has been busy and had to cancel multiple times. I asked her for the documents so I could self-train, I have not received them after multiple requests.

EXHIBIT 8

training and software I requested.  In the email evidence below, I made it clear the software and training was critical and required.  However, he ignored my email.

---

**From:** Soti, Ashin <ashin.soti@abbott.com>
**Sent:** Wednesday, June 15, 2022 3:37 PM
**To:** D'Agostino, Daniel <daniel.dagostino@abbott.com>
**Subject:** RE: Software tools approvals

Daniel,
I need you to focus on activities we have discussed in 1:1.
Concur – not needed until travel/card, don't see that happening in the next 8 weeks
MS Project – not required, just use excel
SolidWorks – not required for the projects in the next 8 weeks
M-files – not required for the projects in the next 8 weeks

Cheers

**From:** D'Agostino, Daniel <daniel.dagostino@abbott.com>
**Sent:** Wednesday, June 15, 2022 11:12 AM
**To:** Soti, Ashin <ashin.soti@abbott.com>
**Subject:** Software tools approvals

Good morning Ashin,

Please approve MS Project (E5 – integrated with Office 365), SolidWorks 2021, and Concur.  You committed to approve them a while back but it has not been done.  As mentioned a few times, these are needed to be effective in my role.  I've included M-Files which is also waiting for your approval.  These software tools are important so I can be effective in my role.

Request Access: D'Agostino, Daniel



In September 2022, Ashin added a manager between him and I. Since then, I began reporting to James Martinez. Since June, I raised the issues of not being allowed to attend Reliability meetings. In September, Ashin had James have me return to the Reliability Meetings. However, I was instructed not to lead the meetings and not to participate unless I was asked a question. It was a very odd request to allow the Sr. Reliability Engineer begin attending Reliability meetings but not contribute in any meaningful way, but I complied.

In November 2022, I was asked to begin contributing to the meetings. As I forecasted in early June, the entire team had zero respect for me. Ashin seemed to discuss his opinions with others. There were multiple rumors about me. One employee came to me and said "I'm sorry". I asked why he was apologizing. He said, "because I believed the things Ashin said. After seeing you and your family at the Christmas party and you engaging with others there, it's clear that it's not true." He mentioned this in confidence, so I'm not at liberty to disclose the name of the person without his permission. Since November 2022, I was asked to instantly be more involved. I have struggled to be more involved with the team due to the significant damage that has been done since June. It is extremely damaging to be isolated, not respected, not appreciated, and nearly all contributions be completely rejected. Anything I propose or say is usually ignored and not valued, despite the value and insights I provide. I do not have an issue with performance, and I have the capacity to be very productive. However,

EXHIBIT 10

given the situation, the environment has become extremely challenging. It has had a significant negative impact on my mental state. I've never experienced anything like it before.

All of my projects or recommendations are quickly rejected or rejected followed by Operations creating their own nearly identical project. For example, I proposed a project to generate $2M+ in cost savings, annually by increasing the accumulation after the Filler, replacing the down bottle reject system just before the Loader, and improving the overall line controls associated with the Accumulator conveyor. The project was quickly rejected but no one ever communicated that it was rejected – it was simply ignored. Operations then created a project to replace the Accumulator and down bottle reject system between the Filler and Loader to make it seem like it was an Operations led effort. I also proposed that we eliminate the Cap tamper band issues to improve quality, reduce jams at the Cap Hopper, and improve product safety. The project was ignored but I believe they implemented a solution to eliminate the issue since I no longer see missing tamper bands on the line and notified them that I was going to report the safety issue with the FDA. They never communicated any information, but I believe they updated the Cocked Cap detector software or settings at the Filler to look for missing tamper bands in addition to cocked caps.

In September 2022, my Direct report (Dino) didn't show up for work. I emailed and called him. He texted back saying he no longer reported to me and that he reported directly to James. There is nothing wrong changing an org structure but the ongoing issues are reaffirmed by the extraordinarily unprofessional behavior to make the change without notifying me, formally or informally. I believe Abbott has a process to change a direct report and requires the process to be followed, however, Abbott allowed for the exception. I would imagine that Abbott probably prohibits that type of behavior, with other employees.

EXHIBIT 11



More recently, I've been asked to provide the top projects for Abbott funding requests. Operations circumvented my job task by adding their top projects directly before I connected with them. I was told by James to follow what they input. I added my own projects and added a second column to prioritize them based on data, such as Filler blocked time. I preserved the Operations prioritization, per James' requirement. James reiterated that I was not to add my own prioritized order. No other engineer was restricted in this manner. Reliability Engineers for the different lines needed to add "1-pagers" for the top 5 projects to discuss when making a request for capital.

All of my colleagues were able to work with Operations to create the list. I was instructed to simply use what they provided. I added a few of my own projects after the first 5. Other people really liked my proposed projects. One was to replace the overhead conveyor and palletizer with a robot palletizer and Autonomous Guided Vehicles. The Overhead Covneyor and Palletizer equipment is past their End of Life and needs to be

Obsoleted. The solution would save money, cost less than replacing the aging equipment, future-proof the line by using a solution that is flexible (we're moving towards aseptic, which will change the line), reclaim a significant amount of much needed real estate, and significantly reduce Filler blocked time which is very important to the organization since it results in financial loss.

Unlike every other engineer who worked on this project for their respective line, my additional projects were removed. James never notified me they were removed. They just disappeared. This didn't happen to any other engineer. Despite being a great idea, having detailed budgetary costs, and having buy-in from others within the Plant – the project was removed just before the meeting and nothing was communicated to me. This did not happen to any other engineer.

In a separate example, we had an issue where the RPB case packers were creating a significant amount of down time where the stack of shipper blanks (flat cardboard boxes) are fed into the machine. Shipper blanks are fed into the machine and wrapped around bottles to form the case. A pressure plate pushing down on a stack of shipper blanks help feed the shippers into the machine, from the bottom. The previous plate was small, creating pressure which is not uniform across the stack of shippers. This causes jams, which leads to significant downtime per month.

I proposed the idea to increase the size of the pressure plates to create more uniformity across the shippers as they were fed into the machine. The Manager from OpEx liked the idea and asked if I could do it. Since the request came from a manager in a different department and it occurred before my boss could stop me, it was not rejected. As a result, I was able to implement it.

Within the same day of proposing the concept, I quickly connected with the machinist and provided a concept I made in CAD (SolidWorks). Within a few days, the design was finalized, the parts were machined, and the pressure plates were installed. During a daily meeting just before they were installed, Gilbert, who works for Steve, mentioned that I wasn't able to run the equipment to test the pressure plates and that I'd have to wait until the equipment was back into operation (the equipment was scheduled to be down for a day). I joked and said I'd run the equipment with empty bottles to test the pressure plates and the next day, you'd see me walking out with a box. I understood that unauthorized bottles are not allowed in the production area. This prevents situations where bottles are mixed in with production bottles. It's also clear that I can't simply turn on and run the equipment without authorization. It was not clear that I wasn't able to check the fit by placing a blank shipper under the pressure plate to confirm the fit.

I wanted to check the fit so I pulled three shipper blanks and checked the fit against the pressure plate while the equipment was not in operation. Steve saw and asked me to come to him. He mentioned I was not allowed to have shipper blanks on the line. I said I wasn't aware and asked how I should discard the Shipper Blanks. He mentioned it was a quality event and I needed to discard them at the recycling center. I went to the recycling center and discarded the 3 shipper blanks.

I was aware that bottles should not be run and the equipment should not be operated without authorization. I learned that unauthorized shipper blanks were also not allowed on the production line, even if they are used to evaluate the fit of a new design. During the next 1:1 with James, he mentioned the quality event and that it was a very serious event and that it was being investigated and there would likely be consequences. James said it's worse because Gilbert "told me not to do it". James was misinformed. I was never told placing blank shippers on the line was not allowed. Gilbert said not to operate the equipment. I never turned on the equipment or brought bottles to the line. It's my understanding that accidents do happen but termination due to an

unintentional event does not typically happen. It's clear they will attempt to state that it was premeditated and intentional by twisting what was actually said to fit their narrative. I believe Abbott will claim that the severity level is increased due to it being intentional. Again, I was never aware that shipper blanks were not allowed on the line. It was clear that I was not allowed to bring in bottles or turn on the equipment. I never turned on the equipment and did not bring in bottles.

After the event, I remembered a situation in April 2022 when Steve and Gilbert were speaking with me on the RPB line after a line clearance. We were located just before the Labelers. I saw a bottle rolling on the conveyor against a rail. It was stationary and located on the outside of the rail. It was stuck in the area and was not picked up during the last line clearance. I mentioned it to Steve and Gilbert. They stopped immediately and looked intensely at each other for more than 5 seconds without saying anything. Steve picked up the bottle, placed it by his side and abruptly said he had to leave to take care of something. As he walked towards the Retorts (away from his office), he threw the bottle in a trash bin and left the area. I continued talking with Gilbert and didn't think much of the event, until the recent event where I learned the significance of a quality event. I recently reported the event but do not believe there will be any consequences when Steve removed the bottle and possibly intentionally hid a major Quality event. I never received a response after reporting it via email to Jim (Corp. Employee Relations Manager), Douglas (Site Director), Ashin, James, and Abram (HR Manager). A quality event has a negative effect on the Operations metrics. It's in his interest to hide it. I'm not sure if it was concealed or properly reported, however, their behavior was odd after mentioning it.

In March 2022, Cobi James brought me three shipper blanks, per my request. He brought them to the Fishbowl (shared office space within the plant) where I was currently talking with Gilbert and Steve. Three shippers were pulled from the production storage area and carried through the line to the Fishbowl. Steve and Gilbert saw Cobi bring the shipper blanks to me. Nothing was ever mentioned or stated about the incident by Steve or Gilbert, who were both in the room. In March, a few weeks after I started, I carried the shippers to my office, through the plant. Again, there were no objections from Steve or anyone else. I was unaware that it was a serious quality event but no one seemed to mind.

On 1/1/23 and 1/2/23, Steve cancelled the daily reliability meetings for those days. They didn't specify why the meetings were being canceled. I was walking by in the hall and noticed the entire team in a meeting room. I entered because I thought I was accidentally left off the invite. They were discussing the reliability of the Case Packers and how to improve. It was definitely a meeting I should have been invited to. All relevant stakeholders were invited and people from other departments, except for me. Further, it was setup as a private meeting so I would not see it on anyone else's calendar. It was intentionally hidden from me. My Boss James was there. My former direct report Dino was there. Several other people from the team were there. It's disappointing that they didn't invite me to the extremely relevant meeting and they setup the meeting to intentionally hide it from me so I could be intentionally excluded.

From July through October 2022, there were three instances of vandalism to my car while in the Abbott parking lot. My car was keyed in the back and the side. Someone likely punched my windshield where there was a baseball-sized ball of cracks from impact. I notified the Employee Relations Manager and Security. The damage is an example of the issues I face daily, manifested into something significantly more tangible. There has been a significant amount of damage to my relationships with colleagues and to my mental health due to the high stress and anxiety, as a result of Ashin's actions and Abbott's enabling of the ongoing issues.

EXHIBIT 14



EXHIBIT 15



I'm being systematically pushed out by Abbott in a manner that attempts to conceal their retaliatory behavior. Abbott's behavior is retaliatory and calculated. For example, they asked me to determine issues why the RPB Labelers are not functioning properly. I quickly met with Operators and Maintenance to understand the issues. I pulled and analyzed data to understand the primary reasons we had downtime with the equipment. I reviewed the Preventive Maintenance records that schedule maintenance for the equipment against the Manual. I verbally specified my recommendations to correct the issues with the team. They ignored the recommendations and chose not to implement the changes which would help improve the reliability of the equipment.

My boss then required me to use the DMAIC process, which I was not exposed to and did not have training for. I requested documentation so I could self-learn the process. I never received a response for the proper training documentation. I did a little research into Abbott's DMAIC process and learned that it was significantly more involved than I expected and would take considerably more time. I expressed this to my boss and he said he was going to tell Senior Staff of the issue. Even after weeks, I still don't have the DMAIC training documentation I requested. I setup multiple meetings for the training with Catherine. She has been busy and had to cancel multiple times. I asked her for the documents so I could self-train, I have not received them after multiple requests.

In another example, I was tasked to takeover my first Capital Project at Abbott during Q4 of 2022 (Dunnage Conveyor Project). I scheduled a meeting with key stakeholders at Abbott to review the requirements and to communicate effectively. Then I scheduled a meeting with the Supplier to review Terms and Conditions and to go over the line items from the proposal. Before I could start using SAP to manage the project, I had to take SAP training since Ashin originally rejected my request for this required training, complete SAP testing, then wait for approvals before I could begin using the software. SAP was one of the software training modules which was required by Abbott but Ashin refused to allow me to take. After obtaining approval to use the software, I followed Abbott's CRC process to get a Purchase Order sent to the Supplier.

While engaging with the supplier on the project, I asked the Supplier to correct the name on the proposal to reflect my name instead of a different employee. The change was never completed so I asked again. The Sales Engineer became upset and said "I don't understand why you continue to send me this request! I've sent the update proposal a number of times already. I assume you are not interested in pursuing this project any longer." I responded with "In the salutation of the quote, it specifies "Mr. Lyle". It should specify "Mr. D'Agostino". I circled the requested change for additional clarification. Every quote received continues to include the wrong information. We are moving forward with the project. Sending conflicting information to our purchasing team may result in it being rejected." He apologized and sent the updated proposal.

Sue, an Abbott Procurement specialist reached out to have me complete the Statement of Work (SOW) for the project. I completed the SOW after going back and forth with Sue to ensure it was correct. Sue came back after sending the SOW to the Supplier and shared their SOW objections. The Supplier stated they wanted 90% upfront which is not typical. They didn't want to provide a manual for the equipment, which is not typical. They also used terms like "Definitely not!" which express a somewhat unprofessional and aggressive tone. They required shipping + handling upfront, which is not typical. They seemed to object to our requirement for Avetta certification to confirm they meet insurance requirements, which is a requirement.

I originally accepted all objections to get the small project executed and made the necessary changes in the SOW then sent the updated version to Sue. Sue responded by stating that she didn't agree with some of the Supplier's objections, stated we couldn't agree to certain terms, and felt that we were giving the farm away. She is a Procurement specialist and this was my first project with Abbott. I agreed with her and changed the SOW again to reject some of their claims, per Sue's recommendations and confirmation that some terms were non-negotiable. I sent an email to the supplier showing which terms were accepted and which were rejected. I also expressed in the email that "Some of your comments and demands are off-putting, unprofessional, and unreasonable. Similarly, some of your emails to me were a bit unprofessional as well."

My new boss (James) scheduled a 1 on 1 with me. He mentioned that my email was unprofessional and the Supplier did nothing wrong. He mentioned that I should have accepted their terms because it was a small project. I explained that I was following the Procurement Specialist's lead and recommendations after originally agreeing to the Supplier's terms. He mentioned that he read the emails and talked to Sue. He reaffirmed that I should have accepted the terms. He continued to state that I was completely in the wrong. He completely disregarded the fact that I originally accepted the terms because it was a small project then changed course because the Procurement Specialist suggested that I do. After the Supplier sent their objections, Sue expressed her thoughts, I updated the SOW, and I sent the Supplier an email; I forwarded the email to the key stakeholders to keep them in the loop. My manager stated that I needed to notify them sooner, even though I learned about the Supplier's objections, updated the SOW, and forwarded the email to the key stakeholders within one day. My boss then said I needed to communicate in person and that I was wrong for not also communicating it in

person as well.  He also stated that I should have communicated with them sooner, even though I communicated with them immediately after updating the terms by forwarding them the email.

Interestingly, my boss's initial response to the email was that we may need to use a different supplier.  After he connected with Ashin, he setup a 1 on 1 for the next day.  During that meeting, he stated that I was wrong, which was completely different from the sentiment from his email response the day before, which was after he connected with Ashin.  He opted to take over the completion of the SOW.  He failed to do it in a timely manner, even though I asked him for a status update to ensure that it was completed.  Sue reached out stating that James' the significant delays to follow through were raising visibility of the issue.  I'm guessing he finished the SOW, however, he has not communicated any details.  I don't even know if I am still required to oversee the project.

In another example, I sent an email to Steve saying "Let's focus less on snarky comments and more on collaborating to come up with the best solution."  My boss stated that the email was unprofessional and cited me for it.  Another employee he manages, Nathan, sent an email to the entire Engineering department that was unprofessional but never reprimanded the employee or even mentioned it to him.  The Engineering Document Coordinator sent an email to the entire engineering team saying "I have been working with Ashin and we created a new calendar for putting in vacation.  I have uploaded it to the SharePoint."  Nathan sent a response to the entire Engineering group saying "Nobody listen to her.  My calendar is better.".  My boss never mentioned the extremely disrespectful and unprofessional email to Nathan but had a problem with my comment to Steve.  I am certain that my Boss's retaliatory and unfair behavior directed against me was orchestrated by Abbott at higher levels – starting with Ashin.

Ashin intentionally stopped me from being effective in my role as retaliation for me having COVID and being out for a week.  He then made it extremely difficult to work at Abbott.  In January 2023, Ashin did something similar to a colleague who was out with surgery for two weeks.  My colleague (Lance) completed most of the work for a particular project but in the two weeks he was out, It's my understanding that they took the project from him and gave it to someone else.  Additionally, there are several Employee Relations (ER) complaints against Ashin Soti.  There is clearly a trend and a body of evidence from several people, however, Abbott found that my claims were "unfounded" after several months of reminding Abbott to investigate the matter.

Ashin intentionally stopped me from being effective in my role as retaliation for me having COVID and being out for a week.  His change in behavior and his actions immediately changed after I notified him that my family had COVID.  His retaliatory actions clearly violate Abbott's policies and procedures.  I brought up my issues with HR (Abram) via email and a meeting but Abbott has accepted and allowed Ashin's behavior, despite a clear violation of Abbott's policies.  Ashin's actions were premeditated, as shown by the evidence above.

Similarly, Abbott has accepted and allowed Steve Nerovich to conduct himself in a very unprofessional manner on a regular basis, although, his behavior has improved significantly over the last 4 months.  This shows a pattern of systemic behavior by Abbott.  Abbott may allow Steve's behavior to be tolerated despite Abbott's policies and procedures, but Ashin's behavior doesn't just violate company policies and procedures – **Ashin and Abbott's behavior violate Federal protections against employment discrimination and retaliation for having COVID.  Further, there are whistleblower protection programs to protect employees from retaliation.  I believe Abbott is attempting to terminate me in a manner that avoids detection requiring whistleblower protections.**

EXHIBIT 18

Abbott's ongoing actions have created a very difficult situation, resulting in significant damages from extremely high stress and anxiety. Jim from Corp Employee Relations acknowledged and summarized my issues as an "untenable" situation, despite knowing this, nothing has been done to attempt to remedy the situation. It's very disappointing that despite this knowledge, Abbott continues to allow the behavior to continue. Despite the overwhelming body of evidence provided to Abbott and the fact that there are several Employee Relations claims against Ashin, Abbott concluded that my claims were "unfounded" - after about 6 months since first bringing it to their attention. It's clear Abbott is working to retaliate against me for reporting the situation and because of the complaint I filed with the FDA. They are attempting to execute the retaliation in a manner that doesn't seem like retaliation, which is deceitful and deliberately undermines the protections provided by the Federal Government.

I have requested that I work from home on multipole occasions. I was denied all requests. I can perform my job from home since all meetings can be easily available online and I rarely have a need to be on the floor or perform an action that requires me to be onsite. About 99% of my job can be performed from home. There are multiple employees who successfully work remotely. Despite this, all my requests for reasonable accommodations have been denied.

I believe I have long COVID symptoms, compounded by the stress and anxiety of the situation caused by Abbott. Since May 2022, I've had excessive concentration issues, cognitive issues, I'm extremely depressed but do not show or talk about it, I have extremely high levels of anxiety, jaw muscle spasms, serious neck muscle issues, excessive ongoing sleep issues – I've had to take an over-the-counter sleep aid every night since May 2022 (bloodwork will verify this), and I have an extremely hard time relaxing. It's been ongoing for 8 months and there is no sign of improvement – it's getting worse due to the situation at Abbott.

Lastly, there is a wake of people who left or have issues with Ashin. This resulted in about 7+ Employee Relations complaints against Ashin. For example, John left several months ago because of Ashin and because he didn't like the direction the company was going. Gwen left months ago while I was out. She didn't seem to like Ashin. Kristen left because she refused to work for Ashin. She came back and now works for a different department. These are people who made it publicly clear that they did not like Ashin for various reasons. Others have not made their opinions public, so I will not share their names.

Sincerely,

Daniel D'Agostino

February 7, 2023

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Phoenix District Office
3300 North Central Avenue, Suite 690
Phoenix, AZ 85012
(602) 661-0002
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 04/15/2023

**To:** Mr. Daniel D'Agostino
5220 West Saint Charles Avenue
Laveen, AZ 85339

Charge No: 540-2023-01849

EEOC Representative and email:    JEREMY YUBETA
Enforcement Manager
jeremy.yubeta@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 540-2023-01849.

On behalf of the Commission,

For

Nancy Sienko
Acting Phoenix District Director

**Cc:**
Director Human Resources
Abbott Laboratories
1250 WEST MARICOPA HWY
CASA GRANDE, AZ 85193

Sarah Chomiak
Abbott Laboratories
100 Abbott Park Rd Dept 33c AP6a-2
Lake Barrington, IL 60084

Please retain this notice for your records.



Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 540-2023-01849 to the District Director at Melinda Caraballo, 3300 North Central Avenue Suite 690

Phoenix, AZ 85012.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions,** such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

Enclosure with EEOC Notice of Closure and Rights (01/22)

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.