Daniel D'Agostino
5220 West Saint Charles Ave.
Laveen, AZ 85339
(602) 999-2065
dagostino.prose@gmail.com

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Daniel D'Agostino, an individual | CASE NO. |
| Plaintiff, | **CV-23-01367-PHX-SMB** |
| v. | **PLAINTIFF'S MOTION FOR RECONSIDERATION OF THE ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 266)** |
| Abbott Laboratories Inc., | |
| Defendant. | Judge: The Honorable Susan M. Brnovich |
| | Original Complaint Filed: July 14, 2023 |

Plaintiff's Motion for Reconsideration (Doc. 266)

## I.    INTRODUCTION

Plaintiff Daniel D'Agostino, appearing pro se, respectfully moves under Local Rule 7.2(g) for reconsideration of the Court's June 4, 2026 Order (Doc. 266) granting Defendant's Motion for Summary Judgment. Reconsideration is appropriate where the Court "committed clear error or the initial decision was manifestly unjust," or where it has "overlooked or misapprehended" matters of fact or law. *Sch. Dist. No. 1J Multnomah Cnty. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993); LRCiv 7.2(g)(1). This Motion does not reargue the merits. It identifies specific, dispositive matters the Order overlooked or misapprehended, and one structural error that denied Plaintiff any opportunity to be heard on the motion the Court actually granted.

Three themes frame the Motion. **First**, the Order resolved genuinely disputed facts against the non-moving party and weighed the evidence—precisely what the summary-judgment standard the Order itself recited forbids. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see* Doc. 266 at 3. **Second**, the Order overlooked record evidence—including Defendant's own documents—bearing on its findings that there is "no evidence of any verbal comments regarding Plaintiff's age" (id. at 8 n.2) and that none of Plaintiff's protected-activity evidence concerns age (id. at 15–16), and it resolved the age-discrimination claim under an incomplete legal standard the Court's own findings contradict. **Third**, the Order did not consider evidence the Court itself had unsealed: on May 1, 2026 the Court ruled that the Employee Relations Investigation Summary Defendant had withheld as "privileged" is "not privileged" (Doc. 246 at 7–8), yet the Order rested on the record as it stood before that ruling and disregarded exhibits Plaintiff had refiled on the public docket at the Court's own direction (Doc. 257).

## II.    LEGAL STANDARD

A motion for reconsideration is appropriate where the Court "(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly

unjust," . . . or (4) is presented with "other, highly unusual, circumstances warranting reconsideration." *ACandS*, 5 F.3d at 1263; *accord* Doc. 266 at 2. The movant must "point out with specificity the matters that [it] believes were overlooked or misapprehended by the Court." LRCiv 7.2(g)(1).

Those standards intersect with the summary-judgment principles the Order recited but, Plaintiff respectfully submits, did not apply. On summary judgment the Court "must draw all reasonable inferences in the nonmovant's favor" and "does not make credibility determinations or weigh the evidence." *Anderson*, 477 U.S. at 255; Doc. 266 at 3. The evidence is viewed "in the light most favorable to the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Doc. 266 at 3. A pro se litigant's submissions are construed liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). Where the Order's findings cannot be squared with those principles, reconsideration is the appropriate corrective.

## III.    ARGUMENT

### A.    The Order Resolved Genuinely Disputed Material Facts Against the Non-Movant and Weighed the Evidence.

Several findings rest on crediting Defendant's account over Plaintiff's record evidence. The Order characterized the temporary denial of software as showing, "at most," "annoyance or inconvenience" (Doc. 266 at 11); found that Plaintiff's "removal from team meetings, relegation to menial tasks, etc.," "fail to evidence any age-based intention" (id. at 10); and treated the May 2023 investigation as a non-event (id. at 17). Each finding is genuinely disputed on the record.

On software, the Order deemed the deprivation minor, but Defendant's own subject-matter expert, Kristin Jepson, testified that SAP was "required" for a senior reliability engineer to "do his job effectively," and "[e]veryone in the Casa Grande site has to have MFILES." (Doc. 229 at 17, 21–22; Doc. 256, Ex. J at 38, 64–65; Doc. 256, Ex. H.) The Validation Master Plan identifies Plaintiff as the "alternate Technical Representative" on

the Review Board responsible for approving validation deliverables "stored in M-Files as the system of record." (Doc. 256, Ex. H.) Defendant's witness James Martinez confirmed that an employee who must approve documents needs M-Files: he testified that he obtained M-Files access "because I have to do more approvals … that require that level of access," that "[n]obody would approve for me," and—asked whether M-Files is required in his current role—"[i]n my current role, yes, because I have to approve plan documents." (Doc. 256, Ex. HH, at 79–80.) Plaintiff was the alternate approver (Technical Representative) on the Validation Review Board (Doc. 256, Ex. H); because approval, unlike document submission, cannot be delegated to a colleague, the same requirement applied to him. Defendant's own Employee Relations summary admits Soti "denied multiple requests D'Agostino made for various applications and/or training." (Doc. 256, Ex. A.) Whether a roughly five-month deprivation of software Defendant's own subject-matter expert called "required" (SAP) and mandatory for every site employee (M-Files) is mere "inconvenience" or a material alteration of working conditions is a quintessential jury question; resolving it for the movant was error. *Anderson*, 477 U.S. at 255.

The Order's treatment of the software-access comparator is a further example. The Order discounted one of Plaintiff's two comparators on the ground that "Plaintiff does not explain who Zadravecz is" and that "Zadravecz remains a mystery." (Doc. 266 at 10.) But "Zadravecz" was a lone typographical error in Plaintiff's Response; the individual is Alex Zemezonak—the only "Alex Z" anywhere in this record, named by Defendant's own Statement of Facts (Doc. 250 ¶ 75) and Plaintiff's Controverting Statement of Facts (Doc. 229), and identified by the Order itself, two pages earlier, as a "substantially younger" comparator "approximately 30 years old" (Doc. 266 at 8–9). Plaintiff also spelled the name on the record at the March 6, 2025 discovery hearing. Drawing all reasonable inferences in the non-movant's favor, the Court was required to read an obvious misspelling as the same "Alex Z" the record uniformly describes—not to treat him as an unidentifiable stranger and strike him as a comparator. *Anderson*, 477 U.S. at 255.

**B.**    **The Order Applied an Incomplete Legal Test to the Age-Discrimination Claim.**

The Order granted summary judgment on the ADEA age-discrimination claim solely because Plaintiff "cannot show that he was replaced by someone substantially younger than him." (Doc. 266 at 19.) That applied an incomplete legal test and is irreconcilable with the Court's own findings.

The fourth element of an ADEA prima facie case is not limited to proof of a younger "replacement." It is equally satisfied where the plaintiff is discharged "under circumstances otherwise giving rise to an inference of age discrimination," including evidence that substantially younger employees were treated more favorably. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207–08 (9th Cir. 2008); *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1049–50 (9th Cir. 2012); *see also Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir. 1990). The prima facie burden is "minimal" and "does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

The Order's own findings supply that inference. The Court found that two instances of age-based differential treatment survived: Defendant denied Plaintiff's time-off request while granting the same to substantially younger employees Arandia and Zemezonak, and denied Plaintiff software access granted to a substantially younger employee. (Doc. 266 at 9–10.) Evidence that substantially younger employees received what Plaintiff was denied is the very "circumstance giving rise to an inference of age discrimination" that satisfies the fourth element. Granting judgment because Plaintiff identified no "replacement," while simultaneously finding that younger comparators were treated more favorably, cannot be reconciled.

To the extent the fourth element turned on a comparator's age, that question was not Plaintiff's to lose on this record. Defendant's Statement of Facts supplied the birth years of its managers but omitted the ages of the younger comparators—a gap Plaintiff specifically identified. (Doc. 250 ¶ 79; Doc. 229 at 201–02.) Plaintiff testified that the younger

comparators were "under 40" while he was in his mid-forties. (Doc. 229 at 26–28 (Controverting SOF No. 16); Pl. Dep., Doc. 256, Ex. K.) On summary judgment the Court was required to draw that reasonable inference in Plaintiff's favor, not resolve the comparators' ages against him. *Anderson*, 477 U.S. at 255.

**C.    The Order's Finding of "No Evidence" That a Substantially Younger Employee Replaced Plaintiff Is Contradicted by Defendant's Own Records.**

The Order resolved the age-discrimination claim on a single factual premise: that, "for the first time," Plaintiff's Response asserted Gilbert Mendez replaced him, that "[t]here is no evidence to support this contention," and that Plaintiff's own Exhibit K—a text reading "we'll have Steve lead the 1015"—"contradicts this claim." (Doc. 266 at 19.) That premise cannot be reconciled with the record. Defendant's own documents show that substantially younger employees assumed Plaintiff's duties in three distinct respects—the 10:15 a.m. Case Packer meetings, the 9:00 a.m. daily Reliability meetings, and the Case Packer project itself—and that the single text the Order relied on reflected only what Plaintiff was told, not what Defendant actually did.

First, as to the 10:15 a.m. Case Packer meetings, Exhibit K reflects what Soti told Plaintiff—that "Steve" would "lead the 1015"—at the moment Plaintiff went out on COVID leave and stopped attending. Defendant's own Employee Relations investigator recorded what actually happened: in his interview of Soti, the investigator noted that "[t]he 10:15 Meetings were the case packers," and that Soti "had Gilbert and Steve oversee the case packer." (Doc. 256, Ex. M.) Defendant's supervisor James Martinez likewise testified that the meeting which displaced Plaintiff was "led by Gilbert Mendez," that he recalled "Gilbert, and Steve leading the meeting," and that Plaintiff "[was] not" invited. (Doc. 256, Ex. HH, at 69–71.) The very meetings the Order attributed to "Steve" were thus overseen by Gilbert Mendez together with Steve Nerovich.

Second, as to the 9:00 a.m. daily Reliability meetings—a separate meeting from the 10:15, and the one Exhibit K does not address—Martinez testified that, asked about

"Gilbert Mendez discussing issues related to downtime," the answer was: "That was daily. That was in the daily reliability meeting," while confirming that optimizing "downtime" on the RPB line was Plaintiff's "responsibility." (Doc. 256, Ex. HH, at 71–72.) Plaintiff testified that Gilbert "cancelled the daily meeting" and then "conducted a case packer meeting and completely removed me from that meeting despite everyone else being invited and hid it from me." (Doc. 256, Ex. K, at 246.) The record thus identifies Gilbert Mendez—not Steve Nerovich—with the daily Reliability meeting Plaintiff had led.

Third, the same records establish that the Case Packer project itself was reassigned, and that it cannot be separated from the 10:15 meetings: Defendant's own investigator recorded that "[t]he 10:15 Meetings were the case packers" (Ex. M), so stripping Plaintiff of those meetings was, by Defendant's own description, stripping him of the Case Packer project. Defendant's investigator asked Soti, "Was Daniel responsible for Case Packer?" Soti answered: "No he had reliability so asked Supervisor to lead the effort on case packer, thus was a short[-]lived leading impact," and—as noted—that he "had Gilbert and Steve oversee the case packer." (Doc. 256, Ex. M.) Defendant's own records therefore confirm that the Case Packer project Plaintiff had been leading was reassigned to Gilbert Mendez and Steve Nerovich.

The Order's observation that Plaintiff identified Gilbert Mendez "for the first time" in his Response does not render the contention unsupported—and the Response identified him squarely: "The record identifies Gilbert Mendez (age 29–30) as the specific, substantially younger employee who replaced Plaintiff in his core leadership responsibilities" (Doc. 233 at 2); "Plaintiff has established that Gilbert Mendez (age 29–30) was leading Reliability meetings before Plaintiff was hired and was then assigned to take over the meetings and core leadership responsibilities" (id. at 15); and "Defendant assert[s] that Steve Nerovich took over reliability meetings, but that is not true, it was Gilbert Mendez" (id.). That Plaintiff's earlier filings had referred to Steve is unsurprising: Soti's contemporaneous text told Plaintiff that "Steve" would lead (Ex. K), and Plaintiff—

removed from the meetings—recited what he had been told. Defendant's own records, produced in discovery, revealed that Soti instead "had Gilbert and Steve" assume Plaintiff's duties.

Mendez was approximately 27 to 30 years old—roughly sixteen years younger than Plaintiff, who was 46. (Doc. 229 at 26–28.) Whether a substantially younger employee assumed Plaintiff's duties is, at a minimum, genuinely disputed on the record; the Order's contrary finding overlooked Defendant's own documents and resolved the dispute against the non-movant. *Anderson*, 477 U.S. at 255. Under the correct prima facie standard (Part III.B), that evidence satisfies the fourth element of Plaintiff's prima facie case.

**D.     The Order Overlooked Controverting Statement of Fact No. 16 and the Record Bearing on Age.**

The Order states that "there is no evidence of any verbal comments regarding Plaintiff's age" and adopts Defendant's assertion that Plaintiff "did not know the ages of his coworkers and does not recall discussing his age." (Doc. 266 at 8 n.2; Doc. 250 ¶ 16.) That overlooked Plaintiff's Controverting Statement of Fact No. 16, which collects fifteen specific deposition passages in which Plaintiff knew or discussed coworkers' ages— including that Soti was "under 40," that Mendez was "27, 28, 29 or 30," and that comparators Arandia and Zemezonak were "under 40" (with Schlitz "probably under 40"). (Doc. 229 at 26–28; Pl. Dep., Doc. 256, Ex. K.) These fifteen passages appear in the operative Controverting Statement of Facts (Doc. 229)—the CSOF the Order elected to "consider" (Doc. 266 at 6)—and not in any stricken filing; no version of the record before the Court lacked them. At a minimum, that paragraph creates a genuine dispute as to Defendant's Fact No. 16—the very fact the Order adopted—and supplies circumstantial evidence of age awareness in the workplace. In candor, those passages reflect Plaintiff discussing others' ages rather than age-based remarks directed at him; but they squarely controvert the adopted finding and bear on the age-nexus inquiry. Because the nexus determination led the Court to consider "only the two identified instances" of age-based

conduct in the hostile-environment analysis (Doc. 266 at 11), overlooking this evidence was not harmless.

**E.    The Retaliation-Causation Analysis Overlooked Defendant's Contemporaneous Knowledge of Plaintiff's EEOC Activity and the Leave-Tolled Timeline.**

The Order held that the only protected activity was the March 2023 EEOC charge, that Defendant first learned of it on March 23, 2023, that every adverse action predating that date "cannot establish causation," and that the October 2023 termination was "too remote." (Doc. 266 at 16–18.) Two matters were overlooked.

1. Defendant had written notice of Plaintiff's EEOC activity on January 20, 2023—not March 23. On that date Plaintiff emailed Curcio, Taylor, Soti, Martinez, and Cordell: "I opted to file with the EEOC yesterday (EEOC Case # 540-2023-01849)." (Doc. 257, Ex. C.) That email was produced by Defendant from its own files, and a February 8, 2023 follow-up advised the same managers that "[t]he EEOC intake interview is scheduled for March 6, 2023." (Id.) The Order's footnote 3 reasoned that Plaintiff "does not attach this alleged charge and therefore cannot evidence" a January date (Doc. 266 at 16 n.3)—but the contemporaneous notice email, in Defendant's own production, is precisely that evidence. The Court did not consider it because it had "disregard[ed] all exhibits attached to Plaintiff's Response" (id. at 7)—exhibits Plaintiff had refiled publicly at the Court's own direction (see Part III.G). Actual knowledge on January 20, 2023 places the February 21, 2023 Written Warning squarely after the protected activity.

2. The "seven-month" gap to termination overlooked that Plaintiff was on protected medical leave for nearly the entire intervening period and that Defendant's documents show the termination decision was made during that leave. A formal "ER Recommendation for Termination" worksheet is dated November 1, 2022. (Doc. 256, Ex. N.) Defendant's Employee Relations investigation log reflects a

June 25, 2023 plan that "Jim will interview and suspend" Plaintiff if he returned (Doc. 256, Ex. NNNN; *see* Doc. 266 at 17), and the investigation closed with a termination recommendation weeks after the right-to-sue letter issued. Where an employer resolves to terminate during protected leave and effectuates the separation at the first administrative opportunity, the gap to the formal separation date does not negate causation; proximity is measured to the retaliatory decision, not the administrative finalization. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). Nor was the intervening period one of inactivity. The Court overlooked the May–August 2023 investigation that the record shows was a vehicle for a predetermined termination: Defendant "never interviewed the most relevant witness, Clare Sollars, and never interviewed Plaintiff himself, leaving the interview form blank," and "relied entirely on hearsay" from witnesses who admitted they were "not involved" in Plaintiff's work. (Doc. 229 at 152–54.) A continuous course of retaliatory conduct linking the protected activity to the termination is itself circumstantial evidence of causation, not a gap that defeats it. The conclusion that "Benefits" alone acted (Doc. 266 at 18) further overlooked Plaintiff's cat's-paw evidence that the managers who built the disciplinary record supplied the basis for separation, and that the benefits file itself recorded Plaintiff's age as 46. *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011); Doc. 256, Exs. ZZZZ, AAAAA.

**F.    The Order Overlooked the Genuine Dispute Over Whether Plaintiff's Separation Was Voluntary.**

Both the discrimination and retaliation analyses treated Plaintiff's separation as an undisputed, "voluntary" long-term-disability election. That premise is genuinely disputed. The only record evidence of the separation is Defendant's own letter, dated October 30, 2023, stating that "[e]ffective 10/24/2023 you exhausted your Short-Term Medical Leave (STML) benefit, at which point your employment with Abbott was terminated." (Doc. 250

¶ 57; Doc. 229 at 103–05.) A termination an employee learns of only after the fact—effective retroactively to a date six days before the notice—is not a "voluntary" choice. Plaintiff's psychiatric records attribute his panic symptoms to "work-related stress" (Doc. 256, Ex. K; Doc. 256, Ex. AAAAA), and Plaintiff testified that his condition was "related to a hostile environment and retaliation" at Abbott (Pl. Dep., Doc. 256, Ex. K). Whether the separation was a voluntary election or the culmination of the documented termination plan—beginning with the "best way out" email of May 27, 2022 (Doc. 256, Ex. P) and the November 1, 2022 termination worksheet (Doc. 256, Ex. N)—is a disputed material fact that should have precluded summary judgment.

**G.    The Order Did Not Consider Evidence the Court Itself Ruled Non-Privileged, and Disregarded Court-Ordered Public Exhibits.**

The Court's own May 1, 2026 Order unsealed evidence material to the issues on summary judgment, yet the Order did not account for it. While Defendant's Motion was pending, Defendant withheld the June 7, 2023 Employee Relations Investigation Summary, asserting attorney-client privilege and moving to enforce the Protective Order; Plaintiff was therefore unable to rely on that document in his opposition. On May 1, 2026, the Court rejected Defendant's assertion and held that the document "is not privileged," describing it as "a routine Employee Relations Investigation Summary by Defendant's Employee Relations investigator concerning Plaintiff's performance." (Doc. 246 at 7–8.) Because that Summary bears on Defendant's stated reasons and the timing of its decision-making, and because a dispositive motion should be decided on a complete record, Plaintiff respectfully requests that the Court consider it on reconsideration. See Foman v. Davis, 371 U.S. 178, 181–82 (1962); Fed. R. Civ. P. 1.

Relatedly, the Order denied Plaintiff's motion to defer ruling under Rule 56(d) (Doc. 228) "as moot," reasoning only that the Court had denied the predicate sanctions motion. (Doc. 266 at 5.) That overlooked the independent ground Plaintiff had raised—that the summary-judgment record was incomplete because responsive evidence had been withheld.

Defendant's own verified Answer concedes that specific responsive communications exist, including a June 9, 2022 email (Doc. 38 ¶ 29), the June 15, 2022 emails concerning the very software-access dispute the Order analyzed (id. ¶ 32), and an October 17, 2023 records request and a November 8, 2023 refusal to produce it (id. ¶¶ 53–54)—yet none were produced, and every motion to compel them was resolved on procedural grounds without reaching the merits. Entering judgment on the inference-of-discrimination and pretext questions while that admitted evidence remained unproduced and unadjudicated was not harmless. See Fed. R. Civ. P. 56(d).

The Order separately disregarded the exhibits to Plaintiff's Response (Doc. 266 at 6), even though Plaintiff had refiled them on the public docket as Document 257 in compliance with the Court's May 1 Order. Those exhibits include the January 20, 2023 email by which Plaintiff notified five Abbott managers of his EEOC charge—evidence central to the causation analysis in Part III.E. Declining to consider evidence a pro se litigant placed in the record at the Court's own direction, and then faulting the Response for lacking record support, is the kind of oversight reconsideration exists to correct.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court reconsider and vacate its June 4, 2026 Order (Doc. 266), deny Defendant's Motion for Summary Judgment, and allow this case to proceed to trial. In the alternative, Plaintiff requests that the Court reconsider Defendant's Motion on the complete record, including the evidence the Court ruled non-privileged on May 1, 2026.

RESPECTFULLY SUBMITTED this 7th day of June, 2026.

_____

By: Daniel D'Agostino

Plaintiff, appearing Pro Se
5220 West Saint Charles Avenue
Laveen, AZ 85339
602-999-2065
dagostino.prose@gmail.com

**PROOF OF SERVICE**

I hereby certify that on June 7, 2026, a true and correct copy of the foregoing was served on all parties in this action in accordance with the Federal Rules of Civil Procedure.

_____

By: Daniel D'Agostino

Plaintiff, appearing Pro Se
5220 West Saint Charles Avenue
Laveen, AZ 85339
602-999-2065
dagostino.prose@gmail.com